## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHARLETTE HAMBRICK, INDIVIDUALLY, and in her capacity as the LEGAL AND PERSONAL REPRESENTATIVE OF THE ESTATE OF ROSS OTTO HAMBRICK,** * | |
| and * | CIVIL CASE NO. _____ |
| **DARIUS KING, INDIVIDUALLY, and in his capacity as the LEGAL AND PERSONAL REPRESENTATIVE OF THE ESTATE OF VICTOR MARCELLUS KING,** * | |
| **Plaintiffs,** * | |
| vs. * | |
| **UNITED STATES OF AMERICA,** * | |
| Serve On: Todd Blanche * Attorney General of the United States U.S. Department of Justice * 950 Pennsylvania Avenue, NW Washington, DC 20530-0001 * | |
| and * | |
| Kelly O. Hayes * United States Attorney District of Maryland * 36 S. Charles Street, 4th Fl. Baltimore, MD 21201-2692, * | |
| **Defendants.** * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Sharlette Hambrick, Personal Representative of the Estate of Ross Otto Hambrick, and

Darius King, Personal Representative of the Estate of Victor Marcellus King, by and through their

undersigned counsel, hereby file this Complaint against Defendant United States of America (referred

1

to as "Defendant") and state as follows:

## PARTIES

1.      Plaintiff Sharlette Hambrick is a resident of Slidell, Louisiana and the legal representative and duly appointed Personal Representative of the Estate of Ross Otto Hambrick.

2.      Plaintiff Darius King is a resident of Fort Washington, Maryland and the legal representative and Personal Representative of the Estate of Victor Marcellus King.

3.      Defendant United States of America ("U.S.A.") is the appropriately named Defendant under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*., for the tort claims in this Complaint.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over all claims against the United States in this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346(b)(1), 28 U.S.C. § 1391(e), and the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. (the "FTCA").

5.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1402(b) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

6.      Medical research in the United States has a long, troubled racial history. The shameful Tuskegee Syphilis Study and exploitation of Henrietta Lacks are but two examples that represent the unfortunately common struggle experienced by Black people throughout American history. Indeed, Black suffering has fueled immeasurable medical progress and profit, without just compensation or recognition. Various documented and undocumented studies have thrived off the dehumanization of Black people.

7.      Yet another tragic example of this struggle can be found in the development of new vaccines and treatments for respiratory syncytial virus ("RSV").

8.      According to the Centers for Disease Control and Prevention ("CDC"), RSV is a common

2

respiratory virus that infects the nose, throat, and lungs.

9.     RSV is transmitted when an infected person coughs or sneezes, through direct contact with an infected person, or by contact with a contaminated surface.

10.    Like the common flu and the common cold, RSV spreads in the fall and winter, usually peaking in December and January.

11.    While RSV usually does not pose serious health risks to healthy children and adults, older adults and children are at increased risk of severe adverse health consequences related to RSV.

12.    RSV can also cause other severe illnesses such as bronchiolitis and pneumonia.

13.    In fact, according to the CDC, RSV is the leading cause of bronchiolitis and pneumonia in children younger than twelve months old.

14.    Symptoms of RSV include runny nose, cough, congestion, sneezing, fever, wheezing and/or loss of appetite.

15.    Symptoms in very young infants may be limited to irritability, lethargy and difficulty breathing.

16.    According to the CDC, RSV is the leading cause of infant hospitalizations in the United States.

17.    Nearly every child will contract RSV by the time they are two years old.

18.    The CDC estimates that 58,000 to 80,000 children under the age of five are hospitalized by RSV.

19.    Infants and young children are at the greatest risk of severe illness caused by RSV with the risk inversely proportional to age.

20.    In 2023, commercially available RSV vaccines began to emerge in the United States.

21.    The Food and Drug Administration has approved two such vaccines for adults and an antibody shot that protects babies and toddlers from RSV.

3

22. At least one of the vaccines has been approved for pregnant women to offer protection to newborns.

23. The early data for the effectiveness of these treatments has been overwhelmingly positive, indicating that thousands of lives will be saved annually and prevent thousands upon thousands of hospitalizations.

24. Tragically, these RSV treatments were not derived through rigorous scientific, moral and ethical procedures.

25. Instead, the early RSV vaccine trials were conducted primarily on poor underprivileged minorities, oftentimes without their consent or knowledge.

26. In the 1960s, the demographics of Washington, DC, were drastically changing. White residents began moving into the suburbs of Maryland and Virginia as Black families from across the south moved to Washington, DC, in search of a better life.

27. In 1962, Defendant, through the National Institute of Health ("NIH"), launched a vaccine program targeting respiratory illnesses, especially RSV.

28. Early RSV vaccine research attempted to duplicate Jonas Salk's work in developing the polio vaccine.

29. Salk developed the polio vaccine by exposing the virus to formaldehyde which rendered the virus intact but impotent.

30. The impotent virus was then injected into the patient whose immune system learned to recognize the poliovirus and effectively fight it.

31. In 1962, researchers at the NIH, led by Dr. Robert M. Chanock, created the first RSV vaccine using Salk's method to deactivate the virus.

32. The vaccine was administered by doctors at a local hospital (the "Hospital") to over fifty children.

4

33. Initial results showed little immune response, with nearly half of the recipients contracting RSV that winter, ten of whom required hospitalization.

34. This was an exponentially high hospitalization rate.

35. As a result of this failure, Dr. Chanock enlisted the services of a pharmaceutical company (the "Pharmaceutical Company") to develop a more concentrated version of the original vaccine.

36. The second version of the RSV vaccine became known as Lot 100.

37. In the mid 1960s, like so many other Black families from the south, Jospeh M. Hambrick brought his wife Emily, daughter Sharlette, and sons Joseph, Jr., and Frederick to Washington, D.C., from Slidell, Louisiana.

38. Unlike the Hambricks, Janet King was a native of Washington, D.C.

39. In 1961, Janet gave birth to her first son, Darius King.

40. In 1965, Pfizer tested Lot 100 on four mice, four guinea pigs and 25 cynomolgus monkeys, which all remained healthy after receiving the vaccine.

41. Based on this scant data, Pfizer deemed Lot 100 safe enough to proceed to human trials.

42. In August 1965, Janet King gave birth to a second son, Victor Marcellus King.

43. According to his family, Victor was a happy baby who was quick to walk and talk and gravitated toward his older brother, Darius.

44. On October 8, 1965, Emily Hambrick gave birth to Ross Otto Hambrick.

45. Family members described Ross Otto as happy and healthy with plump cheeks and a full head of hair.

46. Dr. Chanock began a clinical trial of Lot 100 in December 1965 at several different sites, including a clinic run by the Hospital.

47. Doctors at the Hospital selected the youngest children for the trial of Lot 100, with ages ranging from two to seven months old.

48. Due to their age, these children were at high risk of serious adverse consequences of RSV.

49. Most, if not all, of these children were from Black, low-income families.

50. At least 31 children, including Victor and Ross Otto, were part of the trial.

51. Upon information and belief, Victor and Ross Otto were youngest test subjects and the most vulnerable to adverse health consequences from RSV.

52. Adding to an ever-growing list of scientific, moral and ethical lapses, no one from the NIH, the Hospital or the Pharmaceutical Company informed the King family or the Hambrick family that Victor and Ross Otto were to be test subjects of the trial of Lot 100.

53. Nor did they inform the King family or the Hambrick family that the initial trial of the RSV vaccine failed.

54. Nor did they inform the King family or the Hambrick family that the reason for initial failure was unknown.

55. Nor did they inform the King family or the Hambrick family that Lot 100 contained a higher concentration of the virus.

56. Nor did they inform the King family or the Hambrick family that Lot 100 had undergone only one cursory round of animal testing before being cleared for human testing—and that they intended for Victor and Ross Otto to serve as those human test subjects.

57. Nor did they inform the King family or the Hambrick family that due to their respective ages, Victor and Ross Otto would be at the greatest risk of developing severe adverse reactions to Lot 100.

58. Notwithstanding these ghoulish failures, two-month-old Ross Otto and four-month-old Victor were administered the first dose of Lot 100 in the winter of 1965-66.

59. Initial responses were promising. RSV symptoms were minimal and the children's respective immune systems were developing antibodies—Victor with the strongest antibody response

6

registered..

60.    Red flags appeared several months later, in the spring of 1966, when an outbreak of RSV swept through Washington, D.C. (the "Spring RSV Outbreak").

61.    At least five of the Lot 100 recipients contracted RSV, four of whom required hospitalization, an abnormally high rate.

62.    Given the small sample size of the Lot 100 trial, these adverse results should have shocked Dr. Chanock, the doctors at the Hospital and the Pharmaceutical Company scientists and caused them to terminate the trial. Indefensibly, the trial of Lot 100 continued.

63.    Around the time of the Spring RSV Outbreak, Victor and Ross Otto received the third and final dose of experimental Lot 100.

64.    In early November 1966, Dr. Chanock attended a conference of other researchers conducting Lot 100 trials.

65.    The director of the Hospital presented a paper at the conference indicating that Lot 100 could be causing some children to become violently ill upon contracting RSV as opposed to effectively resisting the virus.

66.    Even after receiving this warning, the Lot 100 trial continued unabated.

67.    In December 1966, another outbreak of RSV occurred in Washington, D.C. (the "Winter RSV Outbreak").

68.    By mid-December, Victor began to show cold-like symptoms. His condition briefly improved but soon began to worsen.

69.    On December 29, 1966, the director of the Hospital decided that it was time to stop the trial.

70.    By that time, it was already too late for Victor and Ross Otto.

71.    On December 30, Victor was hospitalized for his worsening respiratory problems. Upon

admission, he was taking 80 breaths per minute.

72. On that same day, Ross Otto developed an intensifying cough and grew short of breath.

73. That afternoon, Ross Otto was admitted to the Hospital, taking three breaths per second.

74. By January 1, 1967, Victor was taking 100 breaths per minute and running a fever.

75. After coming home early from a New Year's Eve party, Sharon, Janet King's younger sister, learned of Victor's worsening condition and rushed to the hospital to see him.

76. By the time she got there, it was already too late. Victor had passed away.

77. Victor's autopsy showed severe inflammation in his lungs caused by RSV and bacterial pneumonia.

78. Several samples of Victor's lung tissue were preserved.

79. The Hambricks were devout Catholics. When Ross Otto's aunt learned of his hospitalization, she realized that he needed to be baptized.

80. Later that day, a Catholic priest came to the Hospital and, through Ross Otto's oxygen tent, baptized him in the name of the Father, the Son, and the Holy Spirit.

81. On January 2, 1967, at 10:30 am, Ross Otto died.

82. According to the autopsy, Ross Otto's lung tissue also showed severe inflammation from RSV and bacterial pneumonia.

83. Final diagnoses included acute bronchopneumonia and "[b]ronchiolitis and bronchitis due to respiratory syncytial virus, bilateral."

84. Small samples of Ross Otto's lung tissues were also preserved.

85. On the day after Ross Otto's death, the director of the Hospital sent a letter to the NIH outlining the evidence that Lot 100 was making children sicker rather than healthier.

86. Despite referencing the similarities between the failed RSV trial in 1962 and Lot 100, the director of the Hospital wrote that the findings related to Lot 100 were "entirely unexpected."

87.    In the middle of January 1967, the director of the Hospital again wrote the NIH, stating that children in the Lot 100 trial had a more serious clinical response to RSV and enclosed a special protocol for treating Lot 100 recipients who contracted RSV.

88.    The protocol included, among other things, the assignment of a special duty nurse and anticipated "resuscitative measures."

89.    By the end of the Lot 100 trial, 18 recipients of the experimental vaccine at the Hospital would be hospitalized. The Winter RSV Outbreak would claim the lives of two young boys.

90.    Only one person from the study's control group was hospitalized.

91.    Lot 100's failure virtually froze all progress on developing an RSV vaccine.

92.    Then, in the late 1970s, Gregory Prince, a researcher at NIH visited the pathology department at the Hospital asking for any retained samples from the autopsies performed on the two victims of the Lot 100 trial.

93.    He, along with his colleagues at the NIH, believed that understanding why Lot 100 failed was critical to developing an effective RSV vaccine.

94.    The tissue samples were located, and Prince was allowed to take some of the samples back to NIH for further study (the "Samples").

95.    Critical advancements in technology have helped researchers better understand how RSV attacks the body.

96.    The surface of the virus is covered with F proteins that enable the virus to enter human cells; however, the F protein is unstable and can easily shift into a new shape.

97.    For years, scientists were unaware of the unstable form of the virus.

98.    In 2013, scientists at the NIH began developing a method to freeze the F protein in place to gain a clearer picture of its shape.

99.    By the late 2010s, scientists began working on new RSV vaccines using stabilized forms

of the F protein as well as vaccines using active but weakened RSV strains.

100.    The stabilized F proteins, along with the Samples, helped scientists gain an understanding of reasons for Lot 100's failure.

101.    In the mid-2010s, Jay Kolls, a scientist at the University of Pittsburgh, received two slides from the Samples and used RNA sequencing to study the precise way the children's respective immune systems responded to RSV after having received the doses of Lot 100.

102.    When a person is infected with RSV, their immune system produces antibodies that stick to the virus. These antibodies conform to certain contours of the F protein forming a precise fit akin to a lock and a key.

103.    The antibodies' ability to accurately match the contours of the F protein is a critical factor in destroying the virus.

104.    Once the antibodies form this match to the F protein, the immune system retains the ability to replicate the antibodies for years.

105.    Scientists learned that process used to create Lot 100 changed the shape of the F proteins on the surface of the deactivated virus.

106.    This explained why the youngest participants in the Lot 100 trial had the most severe adverse reactions. The deformities in the F proteins contained in Lot 100 caused their respective immune systems to form antibodies that fit the deformed F proteins.

107.    Because the youngest test subjects had never been exposed to RSV in its natural form, their respective immune systems had never developed antibodies that matched the contours on the virus' F proteins in their natural form.

108.    While these test subjects did contract RSV in its natural form, their respective immune systems produced RSV antibodies that matched the deformed contours of the F protein on the virus contained in Lot 100 but not on the virus in its natural form.

10

109. These antibodies were able to stick to the virus but were not able to destroy it.

110. This triggered an enhanced immune response that damaged the lung tissue.

111. Lot 100 also programmed the test subject's respective immune systems to respond to the virus as if it were an allergen or parasitic worm, essentially causing an allergic reaction.

112. Armed with this new information, researchers were able to develop guidelines for the safe development of RSV vaccines and antibody treatments by monitoring the known immune system responses that caused Lot 100's failure and the tragic and entirely avoidable death of Victor and Ross Otto.

113. On May 3, 2023, the Food and Drug Administration ("FDA") approved the first RSV vaccine for use in the United States.

114. On July 17, 2023, the FDA approved a monoclonal antibody RSV treatment.

115. The RSV treatments described above were derived through extensive clinical trials that incorporated safety protocols to offset the severe negative health consequences of the Lot 100 trials.

116. Each of the RSV treatments described above utilize methodologies that assist the immune system in fighting RSV as opposed to defeating the body's immune response and turning it against the patient as Lot 100 did.

117. Each of the RSV treatments have generated significant financial gains for manufacturers.

118. Each of the RSV treatments are expected to increase in global sales in the coming years.

119. Since the 1960s, the NIH has tried to hide its abuse of minority infants, in particular Victor and Ross Otto.

120. The victims were chosen specifically because of their unprotected, minority status and consent was not obtained for the same reason.

121. The victims were unwilling trial participants, in highly experimental tests that were not extensively tested prior to administering to the most highly vulnerable (infants under 12 months), nor

were the previous failures thoroughly or properly studied before significantly increasing the viral concentration of the vaccine and testing it on the most vulnerable.

122.    Time and again, the NIH was given sufficient notice that the Lot 100 test was failing and that the baby test subjects required notice and heightened care to protect them.

123.    To this day, the families of the victims of the NIH have never received justice for the sacrifice forced upon them to the benefit of pharmaceutical companies and the Defendant.

124.    When such a sinister history comes to light, justice requires a balancing of the scales.

### COUNT I: WRONGFUL DEATH

125.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

126.    At all times relevant herein, Defendant had a duty to:

    a.    conclusively determine the cause of the failure of the initial RSV vaccine trial;

    b.    thoroughly test and evaluate the impact that a second vaccine with a higher virus concentration than the first failed trial would have on most vulnerable test subjects before beginning human trials with Lot 100;

    c.    formulate adequate safety protocols to both identify and treat the possible adverse health effects of Lot 100 before beginning human trials;

    d.    inform Victor's and Ross Otto's parents of the possible benefits and dangers associated with participation in the Lot 100 trial;

    e.    obtain informed consent from Victor's and Ross Otto's parents before unilaterally enrolling him in the Lot 100 trial, and

    f.    halt the Lot 100 trial upon evaluation of statistically significant data indicating unacceptable rates of adverse health reactions;

    g.    warn Victor's and Ross Otto's parents that Victor and Ross Otto were at an increased risk

for contracting a serious and potentially deadly case of RSV and direct them to seek immediate medical attention at the first sign that either Victor or Ross Otto exhibited any RSV symptoms; and

h. inform Victor's and Ross Otto's parents of any spikes in RSV infections, such as the Spring and Winter RSV Outbreaks, so that Victor's and Ross Otto's parents could take proper protective measures and constantly monitor Victor and Ross Otto's health.

127. It was foreseeable to Defendant that failure to meet these duties could result in dangerous conditions that could threaten the lives of participants in the Lot 100 trial.

128. Defendant breached these duties proximately causing the deaths of Victor and Ross Otto.

129. As a result of Defendant's wrongful acts and omissions, Victor's and Ross Otto's final days and hours in their short lives were spent in terror, struggling to breathe.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in their favor and against Defendant, finding Defendant liable to Plaintiffs and awarding Plaintiffs all damages recoverable in a wrongful death action including but not limited to sorrow, mental anguish, pecuniary losses resulting from the loss of financial support Victor and Ross Otto could have been expected to provide the next of kin had they lived, the value of Victor and Ross Otto's lost services, such as care, education, training, and personal advice and Victor and Ross Otto's conscious pain and suffering in addition to attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT II: LACK OF INFORMED CONSENT

130. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding and subsequent paragraphs.

131. Defendant had a duty to obtain informed consent from Victor's and Ross Otto's parents before enrolling them in the Lot 100 trial.

132. Specifically, Defendant had a duty to disclose, at a minimum, the following material

information and risks:

    a.  Lot 100 had undergone only cursory testing in laboratory animals;

    b.  there were no safety protocols in place for the Lot 100 trials;

    c.  due to their respective ages, Victor and Ross Otto were the most susceptible to suffer severe adverse health consequences from Lot 100;

    d.  a prior RSV vaccine trial using similar methodology had recently failed due to unusually high hospitalization rates and nearly non-existent immune response for unknown reasons;

    e.  Lot 100 contained a highly concentrated amount of the virus;

    f.  severe adverse health consequences in children as young as Victor and Ross Otto included a high probability of hospitalization; and

    g.  there were no effective treatments for severe adverse health consequences.

133.  The foregoing undisclosed risks were material because a reasonable person would consider them significant in deciding whether to participate in the Lot 100 trial.

134.  The undisclosed material risks listed above materialized when Victor and Ross Otto suffered severe negative health consequences related to Lot 100, resulting in their deaths.

135.  Neither Victor's nor Ross Otto's parents, or any reasonably prudent person, would have consented to participate in the Lot 100 trial if they had been informed of the risks.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in their favor and against Defendant, finding Defendant liable to Plaintiffs and awarding Plaintiffs all damages recoverable in a wrongful death action including but not limited to sorrow, mental anguish, pecuniary losses resulting from the loss of financial support Ross Otto could have been expected to provide the next of kin had he lived, the value of Ross Otto's lost services, such as care, education, training, and personal advice and Ross Otto's conscious pain and suffering in addition to attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## COUNT III: CIVIL BATTERY

136.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

137.   By failing to obtain informed consent from Victor and Ross Otto's parents, Defendant's injection of Lot 100 into Victor and Ross Otto's respective bodies was an intentional and harmful act that led directly to Victor and Ross Otto's respective deaths.

**WHEREFORE**, Plaintiffs demand that this Court enter judgment in their favor and against Defendant, finding Defendant liable to Plaintiffs and awarding Plaintiffs all damages recoverable in a wrongful death action including but not limited to sorrow, mental anguish, pecuniary losses resulting from the loss of financial support Victor and Ross Otto could have been expected to provide the next of kin had they lived, the value of Victor and Ross Otto's lost services, such as care, education, training, and personal advice and Victor and Ross Otto's conscious pain and suffering in addition to attorney's fees, costs and expenses of this lawsuit and such other relief as the Court may deem proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court, after trial on the merits, grant the following relief and judgment:

a.   Order Defendant to adequately and fairly compensate the Estate of Victor Marcellus King and the Estate of Ross Otto Hambrick for all compensable damages under D.C. Code § 16-2701, *et seq.*, as well as costs and such other and further relief as may be deemed appropriate;

b.   Order Defendant to adequately and fairly compensate the Estate of Victor Marcellus King and the Estate of Ross Otto Hambrick for all compensable damages under D.C. Code § 12-101, as well as costs and such other and further relief as may be deemed appropriate;

c.  Award Plaintiffs reasonable costs and expenses incurred in this action, including attorney

fees and expert witness fees; and

d.  Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated May 22, 2026

Respectfully submitted,

*/s/ William H. Murphy, Jr.*
William H. Murphy, Jr., Pro Hac Vice forthcoming

*/s/ Jason P. Foster*
Jason P. Foster, Bar No. WV0008
MURPHY, FALCON & MURPHY
One South Street, 30th Floor
Baltimore, Maryland 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
jason.foster@murphyfalcon.com

*/s/ Ben Crump*
Ben Crump, Pro Hac Vice forthcoming

*/s/ Nabeha Shaer*
Nabeha Shaer, Pro Hac Vice forthcoming

*/s/ Brooke Cluse*
Brooke Cluse, Pro Hac Vice forthcoming

*/s/ Sue-Ann Robinson*
Sue-Ann Robinson, Pro Hac Vice forthcoming
BEN CRUMP LAW, PLLC
633 Pennsylvania Avenue, NW, Floor2
Washington, DC  20004
*Court@BenCrump.com*
*Nabeha@BenCrump.com*
*Brooke@BenCrump.com*
*SueAnn@BenCrump.com*

16

*/s/ Carol D.  Powell Lexing*
Carol D. Powell Lexing, Pro Hac Vice forthcoming
LAW OFFICE OF CAROL D. POWELL LEXING
& ASSOCIATES, PLC
2485 Tower Drive, Suite 6
Monroe, Louisiana 71201
Telephone: (318) 324-0700
Facsimile: (318) 324-0702
legaldove2@yahoo.com

*Attorneys for Plaintiffs*

17